**Som P. AGARWAL, Appellant,**

v.

**REGENTS OF the UNIVERSITY OF MINNESOTA, John Q. Imholte, Gordon R. Bopp, Laird H. Barbar, Ernest D. Kemple and Richard W. Burkey, Appellees.**

No. 85–5226.

United States Court of Appeals, Eighth Circuit.

Submitted March 25, 1986.

Decided April 10, 1986.

---

Som P. Agarwal, pro se.

Thomas Tinkham, Minneapolis, Minn., for appellees.

Before ROSS, BOWMAN and WOLL-MAN, Circuit Judges.

PER CURIAM.

Som P. Agarwal appeals *pro se* from two orders of the district court[1] granting partial summary judgment and, later, judgment to the defendants in a suit filed by Agarwal challenging the termination of his faculty employment as a tenured Associate Professor of Physics at the University of Minnesota, Morris (the University). For reversal, Agarwal contends the district court erred 1) in granting the defendants' motion for summary judgment on his due process claims; 2) in finding that he failed to establish a prima facie case of discrimination on the basis of race and religion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and 3) in finding that he was not denied equal protection in that, contrary to his allegations, he was not treated differently than other faculty members because of his race and religion. We affirm.

## I. Background

Agarwal, an East Indian Caucasian and a Hindu, was first employed as a faculty member in the Physics Department, Division of Science and Mathematics, at the University in 1965. In 1966 he was granted tenure and promoted to associate professor. In 1973, 1974, 1975, and 1977, Agarwal was recommended for promotion to the rank of full professor by a unanimous vote of his senior colleagues. Each time, however, his promotion either was not endorsed by Provost John Q. Imholte or was denied by the University's Central Administration.

In February 1977, Agarwal was charged with plagiarism in the preparation of three physics laboratory manuals for use in intro-

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

ductory courses on the Morris campus of the University. Following an investigation conducted by Provost Imholte, Agarwal was strongly reprimanded for his behavior and his merit increase in salary for the 1977–78 academic year was withheld.

In December 1977, eight physics majors, all students and former students of Agarwal, filed a formal grievance against Agarwal alleging that he had displayed a lack of moral integrity in the plagiarism incident and in his unauthorized examination of confidential documents concerning another professor, and that he was incompetent as a teacher, frequently harrassing students and behaving in an unprofessional manner toward colleagues. These charges were heard by a five-member faculty committee, the French Committee, appointed by Provost Imholte. The French Committee found that the students' charges were supported by the evidence and that each charge justified Agarwal's dismissal.

Thereafter, in accordance with section 13 of the University Regulations Concerning Faculty Tenure, Provost Imholte notified Agarwal that he proposed to terminate Agarwal's faculty appointment as of June 15, 1979. Imholte's letter listed as reasons for his action the matters and events upon which the students' grievance had been based and included a copy of the French Committee's report.

Agarwal filed a complaint with the Faculty Senate Judicial Committee challenging his termination. A panel of three faculty members was appointed to hear Agarwal's appeal. The issues on appeal were limited to the incompetency and the plagiarism charges. Subsequent to a formal hearing, the committee recommended Agarwal's dismissal by a two to one margin. The majority of the panel concluded "that Professor Agarwal [was] not a competent teacher and that his level of competence [was] so low that it seriously impair[ed] his usefulness to the University." In addition, the majority felt "that the demonstrated plagiarism with the intent to deceive ha[d] ended Professor Agarwal's usefulness to the Univer-

sity and, in and of itself, [was] grounds for termination."

The committee's conclusions and recommendation were reviewed by C. Peter Magrath, the President of the University, who found that Agarwal's incompetency as a teacher justified his dismissal. At Agarwal's request, a formal hearing was held before the University's Board of Regents on September 4, 1980. The Board unanimously approved the President's recommendation that Agarwal be terminated.

Agarwal filed a discrimination claim with the EEOC and later filed suit in the district court against the Board of Regents, Provost Imholte, the Academic Dean of the University's Morris campus, and three University professors, seeking reinstatement, including back pay and benefits with interest, damages, and declaratory and injunctive relief. In an order dated November 10, 1982, the district court 1) granted summary judgment to the defendants on Agarwal's first amendment and due process claims; 2) dismissed Agarwal's Title VII claim as to the individual defendants, except Imholte, because they were not named in Agarwal's EEOC complaint; 3) dismissed Agarwal's claim for money damages under 42 U.S.C. §§ 1983 and 1985(3) on the basis of the eleventh amendment, except as to the five individual defendants to the extent they were sued in their individual capacities; and 4) dismissed Agarwal's claim for compensatory, liquidated and punitive damages sought for the alleged violation of Title VII. Subsequent to trial on the remaining issues, the district court held that Agarwal had failed to make a prima facie case under Title VII in that he had failed to prove he was qualified for the position from which he was discharged. With regard to his claims under 42 U.S.C. §§ 1983 and 1985(3), the court found that Agarwal had failed to prove disparate treatment. Further, the court found that if Agarwal were treated differently than other professors, differential treatment was the result of personality conflicts and not the product of racial bias. This appeal followed.

## II. Discussion

### A. Fourteenth Amendment Claims [2]

#### 1. Substantive Due Process

■ Agarwal contends the stated reason for his discharge and the evidence supporting the decision to terminate his employment were legally insufficient in at least three respects.

First, Agarwal argues that under section 11 of the Faculty Tenure Regulations [3] discharge is an extreme measure, appropriate only when a faculty member's physical or mental capacity to perform his or her duties is indefinitely or permanently impaired. He distinguishes his case as "a situation where a faculty member's effectiveness is temporarily questioned." As the district court noted, Agarwal's argument is a clear distortion of the plain meaning of section 11. It disregards the portion of that provision which sets out usefulness to the University, the ground upon which the decision to discharge Agarwal was premised, as cause for removal. With respect to Agarwal's attempt to distinguish his situation, the University decided any question of his effectiveness as a teacher within its termination proceedings. The nature and finality of the action taken (i.e., discharge) implies that, in the University's estimation, the impairment in Agarwal's usefulness was neither temporary nor questionable.

Agarwal next contends that the decision to terminate him for cause is unsupported by substantial evidence in that the French Committee and Provost Imholte indicated prior to the Judicial Committee hearing that incompetence was only sufficient if considered in connection with other charges. These other charges, with the exception of plagiarism, were later found to be unsubstantiated. With respect to the plagiarism charge, Agarwal maintains that because he had been previously punished for the offense and had been led to believe the issue was closed, it was constitutionally impermissible for the University to admit and consider evidence concerning the plagiarism incident as either independent ground for his dismissal or as reflective of his professional competence.

In addressing this argument the district court correctly noted that neither the recommendations of the French Committee nor the arguments of Imholte's counsel at a pretrial conference prior to the Judicial Committee hearing were binding interpretations of the evidentiary requirements for removal under section 11. Under section 13(c) of the regulations, that authority is initially vested in the Judicial Committee and, on review, in the University's President and Board of Regents. Finally, the issue of whether the doctrine of res judicata would prevent the Judicial Committee from examining evidence of plagiarism in Agarwal's case was briefed and argued at a pretrial conference prior to the committee's hearing. Contrary to Agarwal's contention, it appears that neither state law nor University regulations precluded consideration of his past offenses in the context of proceedings for his discharge. *See State ex rel. Turnbladh v. District Court of Minnesota,* 259 Minn. 228, 107 N.W.2d 307, 312 (1960); *Turck v. St. Cloud Civil Service Board,* 268 N.W.2d 899, 903 (Minn. 1978).

---

**2.** Agarwal has alleged that his dismissal deprived him of a liberty interest in his professional reputation. Although liberty interests may be implicated in cases involving the dismissal of a state employee from his or her position, this is not such a case. *See Board of Regents v. Roth,* 408 U.S. 564, 573–75, 92 S.Ct. 2701, 2707–08, 33 L.Ed.2d 548 (1972). As a tenured faculty member, however, Agarwal had a protectible property interest in continued employment. *Id.* at 576–77, 92 S.Ct. at 2708–09. He was, therefore, entitled to due process prior to his dismissal. *Id.*

**3.** Section 11 provides in part:

> Every person who holds a faculty position is subject to temporary or permanent removal for cause before the time set for the regular termination of his appointment. The causes for temporary or permanent removal are only such as seriously interfere with the person's capacity competently to perform his duties, or with his usefulness to the University.

(November 10, 1982, Order at 7).

Agarwal's final challenge to the sufficiency of the evidence supporting his discharge is based upon the absence of any in-class assessment of his competence by his peers. This argument is clearly meritless. Judicial review does not function to determine *de novo* whether the court would have terminated Agarwal based on the evidence presented during the hearings afforded Agarwal by the University. *King v. University of Minnesota,* 774 F.2d 224, 227 (8th Cir.1985). The district court correctly held that a court's role is limited to examining the record of University proceedings to determine whether there was substantial evidence to support its determination. *Wood v. Strickland,* 420 U.S. 308, 325–26, 95 S.Ct. 992, 1002–03, 43 L.Ed.2d 214 (1975). We agree with the district court that substantial evidence in the form of the students' testimony concerning Agarwal's classroom conduct, the opinions offered by his colleagues concerning the competence of a professor who would engage in such conduct, and the results of student evaluation surveys, supported the decision to terminate Agarwal's employment.

### 2. Procedural Due Process

■ Agarwal claims that he did not receive adequate notice of the criteria by which his competence would be judged at a reasonable time before his termination was proposed. In particular, he contends he had no notice that his teaching method was deficient or that student evaluation forms could be used to assess a professor's competence.

This court recently outlined the requirements of procedural due process in a similar case:

1) clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to them;

2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges;

3) a reasonable time and opportunity to present testimony in his or her own defense; and

4) a hearing before an impartial board or tribunal.

*King,* 774 F.2d at 228 (citing *Brouillette v. Board of Directors of Merged Area IX,* 519 F.2d 126, 128 (8th Cir.1975)). These requirements of procedural due process clearly do not necessitate that Agarwal receive notice of and an opportunity to remedy his deficiency or that he be made aware of the possible uses of student evaluation survey data. Moreover, the record indicates that Agarwal was accorded all the process he was due under these requirements in the instant case. Agarwal received prior notice of the charges against him and was represented by counsel in all subsequent proceedings. Further, during the hearings before the Judicial Committee and the Board of Regents, he took full advantage of his rights to present evidence and to call and cross examine witnesses. Finally, that the full formal procedural safeguards of the fourteenth amendment may not have been observed during the proceedings of the initial French Committee does not establish that Agarwal's right to procedural due process was violated in light of the formality of the later hearings.

In sum, Agarwal's due process claims lack any legal merit. Therefore, the district court was correct in granting summary judgment to the defendants on this issue.

### B. Title VII Claim

■ Agarwal contends that the district court erred in finding that he failed to make a prima facie case under Title VII.[4] The district court held that Agarwal had failed to establish that he was competent to

---

**4.** To establish a prima facie case of discriminatory discharge, Agarwal was required to show 1) that he is a member of a protected class; 2) that he is qualified for the job that he was holding;

and 3) that he was discharged from the position. *Boner v. Board of Commissioners of Little Rock Municipal Water Works,* 674 F.2d 693, 696 (8th Cir.1982).

hold the job from which he was terminated. Agarwal maintains in his brief on appeal that his retention of the position for fifteen years prior to termination, his promotion to associate professor with tenure in 1966, and his recommendation by senior colleagues for promotion to full professor on four separate occasions were conclusive proof of his competency.

Although these factors support the conclusion that Agarwal advocates (i.e., that he was competent and qualified to teach), they are not dispositive of the issue. That he held his position for fifteen years before he was terminated for incompetence does not prove that he performed his duties competently during his period of employment or that he was competent when he was dismissed. Further, the tenure decision was remote in time from the decision to terminate Agarwal. Many events which occurred in the intervening years (i.e., plagiarism and well-documented student and faculty complaints about Agarwal's substandard performance) were arguably more probative of Agarwal's current capabilities. Finally, Agarwal was apparently last recommended for promotion by his senior colleagues in 1977, immediately *prior* to widespread publication of the plagiarism incident and to the students' grievance which led to his dismissal. In light of these facts, the district court's determination that Agarwal failed to establish a prima facie case under Title VII was not clearly erroneous.

## C. Civil Rights Claims

■ In his amended complaint, Agarwal alleged his civil rights had been violated as the result of a conspiracy among the five individual defendants. Agarwal contended that he had been subjected to disparate treatment, culminating in his discharge, and that racial and religious prejudice had motivated both the conspiracy and the treatment he received. 42 U.S.C. §§ 1983, 1985(3).

Agarwal's primary contention in support of his claims is that he was treated more harshly than similarly situated non-minority professors. He maintains 1) that low student evaluation survey results were used to justify his discharge for incompetence, even though such results had not previously been used for that purpose and other non-minority faculty members had lower evaluative ratings than his own, and 2) that other non-minority professors had prepared laboratory manuals in the same manner he had employed, but none of them had been charged with plagiarism, disciplined or dismissed from their positions. Additionally, in his brief on appeal, Agarwal claims that Defendant Bopp referred to Agarwal's "cultural differences" in correspondence, that Defendant Burkey referred to Agarwal and another Indian professor as "black-haired people," and that Defendant Imholte referred to Agarwal and the same other Indian professor in "derogatory terms" in a memo to the chairman of Agarwal's department.

The record indicates that Agarwal's allegations of disparate and discriminatory treatment are either factually incorrect or legally irrelevant to his claims. First, student evaluation survey data were not the sole evidentiary bases of the termination decision. The Judicial Council Committee also relied upon the testimony of students and other faculty members, as well as an expert witness' interpretation of the survey data. Second, although other professors may have scored lower than Agarwal on isolated items in the survey, Agarwal's pattern of scores on the survey viewed as a whole placed him at or very near the bottom when compared with his peers. Third, although there was some testimony concerning possible plagiarism by other professors in the sciences, there was no evidence that these violations were condoned by the University Administration. Finally, the derogatory comments by the various defendants of which Agarwal complains do not appear to have been motivated by racial or religious prejudice. Provost Imholte's comments were confined to an assessment of Agarwal's professional conduct and performance. Further, Dean Bopp's alleged reference to "cultural differences" does not on its face evidence invidious discriminatory animus toward Agarwal or others who share his racial heritage or religious traditions.

**510**

In sum, the district court did not clearly err in concluding that Agarwal failed to state a claim under either § 1983 or § 1985(3), because he did not establish that he was treated differently due to his race and religion.[5]

Accordingly, the orders of the district court granting judgment to the defendants in this matter are affirmed.

**5.** In his brief on appeal, Agarwal cites this court's initial opinion in *Bibbs v. Block* in support of his discrimination claims. 749 F.2d 508 (8th Cir.1984), *vacated,* 778 F.2d 1318 (8th Cir. 1985) (*en banc*). Agarwal contends that his showing regarding disparate treatment equalled that made in *Bibbs* (i.e., he established that his race and/or religion was a discernible, if not a determining, factor in the employment decision). He argues, therefore, that the district court's failure to find a mixed-motive in his case was clearly erroneous. However, from its very inception, this litigation has followed the typical evidentiary framework described in the second *Bibbs* opinion: Agarwal has contended that one reason—race—was operative, the University has contended that another reason—ability to do the job—motivated it, and the trier of fact found ability, not a combination of the two reasons, to be the true one. *Bibbs,* 778 F.2d at 1320–21. In this context, Agarwal's retrospective attempt to phrase his case in mixed-motive terms is not persuasive.